J-S54045-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN RE: V.B., A MINOR
:   IN THE SUPERIOR COURT OF
:       PENNSYLVANIA
:
APPEAL OF: C.M., NATURAL FATHER    :
:
:   No. 691 WDA 2017

Appeal from the Order April 10, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-064-2016

BEFORE:   OTT, MOULTON, and FITZGERALD[*], JJ.

MEMORANDUM BY FITZGERALD, J.:        FILED NOVEMBER 03, 2017

Appellant, C.M. ("Father"),[1] appeals from the order dated April 10, 2017 in the Court of Common Pleas of Allegheny County, involuntarily terminating his parental rights to V.B. ("Child"), born in February of 2015, pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (b) of the Adoption Act.[2] Father claims that the trial court erred in terminating his parental rights under subsection (b).  We affirm.

The relevant facts and procedural history of this case are as follows. Mother and Father were never married.  Prior to Child's birth, there were several reported incidents of domestic violence between Mother and Father.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] As noted below, Child's natural mother, T.B. ("Mother"), is deceased.

[2] 23 Pa.C.S. §§ 2101-2938.

On September 28, 2014, the police responded to a call pertaining to a domestic violence incident between Mother and Father. The police observed Mother with a bloody lip and a swollen face. Mother was transported to the hospital for medical care, and Father was charged with simple assault and recklessly endangering another person. In October of 2014, Mother filed a Protection from Abuse ("PFA") petition against Father after another domestic abuse incident occurred between them. Mother was granted a temporary PFA order against Father on October 8, 2014.

On November 9, 2014, the police responded to another domestic abuse call that Father dragged Mother down the steps. When the police arrived, they observed Mother, pregnant with Child, in a disheveled state with scratches and a swollen jaw. Mother was transported to the hospital for medical attention, and Father was charged with aggravated assault causing serious bodily injury, aggravated assault on an unborn child, terroristic threats, stalking, and harassment.

Mother has a long history with Allegheny County Office of Children, Youth and Families ("CYF") as a dependent child until she aged out of CYF's care. In December of 2014, Mother voluntarily re-entered CYF's care as a resumption youth, seeking assistance for housing and domestic violence. CYF placed Mother at Gwen's Girls, a group home for pregnant teens and young children. Shortly thereafter, Mother filed another PFA petition against Father. On December 11, 2014, Mother was granted a temporary PFA order

against Father. On December 23, 2014, Father consented to and signed a final PFA order, effective until December 23, 2017. On March 3, 2015, about a month after Child's birth, Mother filed an Indirect Criminal Contempt ("ICC") complaint against Father for violating the December 23, 2014 final PFA order. Father consented to and signed a court order that extended the final PFA order to March 25, 2018.

On May 6, 2015, CYF received notification from Paternal Grandmother that Father left the three-month-old Child in her care without any clothing, diapers, formula or other baby essentials on about May 4, 2015. Paternal Grandmother did not know where Father was or when he coming back for Child, and could not get in contact with either Mother or Father. CYF later found out that Mother left Gwen's Girls with Child to spend the weekend with Maternal Grandmother, but failed to return or respond to calls from Gwen's Girls. CYF became concerned that Child was with Paternal Grandmother and not Mother due to Mother's history of domestic abuse with Father and her active PFA order against him. On same day, CYF obtained an Emergency Care Authorization ("ECA") and removed Child from Paternal Grandmother's care.

On May 7, 2015, CYF learned that Mother and Maternal Grandmother had been murdered at Maternal Grandmother's home. At the shelter care hearing on May 8, 2015, Father failed to appear and his immediate whereabouts were unknown. The trial court placed Child into foster care.

The trial court further ordered that Child's location was to remain confidential and Child was to have no contact with Father. Father did not appear at the adjudication hearing on June 3, 2015, because he was in jail in Essex County, New Jersey, and subsequently charged in the homicides of Mother and Maternal Grandmother, as well as the kidnapping of Child. At the hearing, the trial court adjudicated Child dependent. The trial court further awarded CYF legal and physical custody of Child, and continued Child's placement at the same kinship foster home, where Child currently resides. Father was subsequently extradited to Pennsylvania and was incarcerated in Allegheny County Jail pending trial on homicide and kidnapping charges. CYF sent Father a family service plan ("FSP") in June 15, 2015. Father's FSP goals were: (1) to maintain contact with CYF, (2) to alert CYF of his status, and (3) to complete a full assessment. On August 7, 2015, the trial court appointed Foster Mother as the educational and medical decision maker for Child.

Thereafter, several permanency review hearings were held between 2015 through 2016. At each permanency review hearing, the trial court continuously ordered that Child's placement remain confidential and Child not to have contact with Father. Father has not seen or had any type of contact with Child since he left him at Paternal Grandmother's house in May of 2015.

On March 30, 2016, CYF filed a petition for involuntary termination of Father's parental rights to Child. On November 9, 2016, the trial court held a termination of parental rights hearing for Child. CYF presented testimony from two CYF caseworkers, two police officers, and expert testimony from psychologist, Neil Rosenblum, Ph.D. Father, represented by counsel, was present at the hearing, but did not testify. Following the termination hearing, the trial court ordered the parties to submit findings of fact and legal briefs, and took the matter under advisement. On April 10, 2017, the trial court entered an order terminating Father's parental rights to Child pursuant to Sections 2511(a)(2), (5), and (b).

On May 10, 2017, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Father raises the following issue for our review.

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of Father's parental rights would serve the needs and welfare of Child pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 6.

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only

upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations, quotation marks, and alterations omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G., 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa. Super. 2003) (citations omitted).

Section 2511 of the Adoption Act controls the termination of parental rights, and requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (citation omitted).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), and (5), as well as (b). Father does not challenge the trial court's finding of grounds for termination under Section 2511(a). Instead, Father concedes that CYF clearly and convincingly established grounds for termination pursuant to Section 2511(a)(2). Father's Brief at 13. We, therefore, analyze the trial court's termination pursuant to Section 2511(b) only, which provides as follows:

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. In re K.Z.S., 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. Id. at [7]63.

In re I.E.P., 87 A.3d 340, 346 (Pa. Super. 2014) (citation omitted).

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted). The trial court may emphasize the safety needs of the child. See In re K.Z.S., 946 A.2d at 763-64 (affirming the involuntary termination of the mother's parental rights, despite the existence

of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

In addition, our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." In re T.S.M., 71 A.3d at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to Section 2511(b): "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." Id. at 269.

With regard to its analysis of Child's needs and welfare, and the effect of severing any bond between the Child and Father, the trial court stated:

> CYF caseworkers, Lawrence Walter and Melissa Fuchs provided credible evidence that [F]ather had only seen [C]hild a couple of times, before he abandoned [C]hild with no food, diapers and clothes at [Paternal Grandmother's] home. The record is clear that [C]hild has never lived with [F]ather and there is no attachment or bond. CYF provided clear and convincing evidence that there is no bond between [F]ather and [C]hild and that [F]ather has never provided [C]hild with any of the intangible dimensions that encompass the needs and welfare of a child, and the love, comfort, security and closeness entailed in a parent/child relationship . . . . In addition, this court finds that termination of [F]ather's parental rights would not cause [C]hild to suffer any

extreme emotional consequences since the record is clear that [C]hild did not have a bond or any attachment with [F]ather.

[C]hild has resided with his current [F]oster [M]other/pre-adoptive parent since May 2015. [Foster Mother] has been [C]hild's primary caregiver for most of his life and the only parent figure [C]hild has known. As noted in Dr. Rosenblum's Interactional Evaluation report dated June 3, 2016[, F]oster [M]other is [C]hild's primary attachment/security figure. Dr. Rosenblum's report states that, "[Child] is currently in a very significant and important attachment at this time. He literally becomes upset when he is away from [F]oster [M]other with the exception of his time in his day care program. As a result, his ability to attach to an alternative caregiver would be highly compromised and undoubtedly traumatic to [Child] as well." Dr. Rosenblum opined that there is no potential for [C]hild to have any type of meaningful relationship, let alone an attachment or familiarity with [F]ather. Dr. Rosenblum testified that introducing [C]hild to [F]ather at this time would be stressful and risky and any attempt to change [C]hild's primary caregiver now would compromise [C]hild's emotional well-being and would be undoubtedly traumatic. Dr. Rosenblum opined that [C]hild's developmental needs and emotional well-being would be best served through the goal of adoption, as it would provide [C]hild with the needed permanency and the opportunity to develop a secure and trusting relationship while remaining in a home capable of meeting his needs.

The court also found clearly and convincingly that [F]oster [M]other is providing [C]hild with both the tangible and intangible dimensions of his needs and welfare. [CYF c]aseworker, [Ms.] Fuchs testified that [C]hild is doing well and is developmentally on target and all of his needs are being met by his foster family. Ms. Fuchs also testified that she has observed [C]hild with [F]oster [M]other, opining that [C]hild appears very happy and comfortable in the foster home and displays an attachment to [F]oster [M]other. The caseworker also stated that [C]hild calls [F]oster [M]other "mama."

> The record is clear that [F]ather has not been able to remedy the conditions which led to [C]hild's removal and continues to be incapable to parent [C]hild. It clearly does not meet [C]hild's needs and welfare to continue to wait for [F]ather to be in a position to provide permanency due to his uncertain future. Thus, due to [C]hild's young age and need for permanency and [F]ather's continued inability to meet the developmental, physical and emotional needs and welfare of [C]hild, it is clear that termination meets the needs and welfare of [C]hild.

Trial Ct. Op., 6/5/17, at 8-10 (citations omitted).

Father, however, argues that the trial court abused its discretion in concluding that termination of his parental rights would best serve Child's needs and welfare pursuant to 23 Pa.C.S. § 2511(b), which focuses on the best interests of the child and not on the fault of the parent. Father's Brief at 10. Father claims that, contrary to Section 2511(b), the trial court faulted him for being incarcerated and absent in Child's life and unfairly compared what it perceived as Foster Mother's thriving relationship with Child against what it perceived as his hindered relationship with Child due to his incarceration. Id. at 10, 16. Father further contends that the trial court placed great weight on Dr. Rosenblum's opinion that removing Child from Foster Mother would be harmful to him, but failed to acknowledge that the circumstances for Father's absence from Child's life since the time of his placement were and continue to be completely out of Father's control. Id. at 17. Father argues that terminating his parental rights when he has been incarcerated on charges for which he has not been tried or convicted of deprives him of his constitutional right to parent his son and deprives Child

of his right to his parent and extended family. Id. Father, therefore, contends that the order terminating his parental rights to Child should be reversed. Id. at 18. We disagree.

Here, the record substantiates the trial court's termination of Father's parental rights to Child pursuant to Section 2511(b). During the termination hearing, Mr. Walter, the initial CYF caseworker, provided the trial court with the history of the case and the circumstances leading to Child's placement in foster care. N.T., 11/9/17, at 9-14. Mr. Walter testified that prior to Mother's death, Father may have seen Child twice. Id. at 55. Mr. Walter further testified that Father has not had any contact with Child since he abandoned him at Paternal Grandmother's house in May of 2015. Id. Mr. Walter stated that Child has resided in the same kinship foster home since May of 2015. Id. at 90. Mr. Walter informed the court that Child looks to Foster Mother to meet his needs, and Foster Mother meets his educational, medical, and developmental needs. Id. at 90-91.

Ms. Fuchs, the subsequent CYF caseworker after Mr. Walter, testified that she was assigned the case as the family services caseworker in March of 2016 and then as the home study caseworker for adoption in February of 2017. Id. at 98. Ms. Fuchs stated that she observed Child at his foster home with Foster Mother. Id. at 101. Ms. Fuchs opined that Child is comfortable at his foster home. Id. Ms. Fuchs testified that Child calls Foster Mother, "Mama." Id. at 102. Ms. Fuchs further testified that Foster

Mother is very active with Child, and Child seeks her out if he needs anything, wants anything, or just is seeking attention. Id. Ms. Fuchs has no concerns regarding Foster Mother's capability of providing stability to Child. Id.

Dr. Rosenblum testified via telephone as an expert in child psychology and forensic evidence. Id. at 118. Dr. Rosenblum stated that he conducted an interactional evaluation of Child with Foster Mother on June 3, 2016. Id. Dr. Rosenblum testified that Child was about fifteen months old at the time of the evaluation. Id. at 120. During the evaluation, Dr. Rosenblum observed Child display signs of separation and stranger anxiety, noting Child stayed with Foster Mother and was very cautious of Dr. Rosenblum's presence. Id. at 120-121. Dr. Rosenblum found that Child was reluctant to leave Foster Mother, constantly making sure that Foster Mother was still present and regularly returning to her care throughout the session. Id. at 124-125. Dr. Rosenblum opined that Child is emotionally dependent on Foster Mother and views her as his primary security figure. Id. at 121. Dr. Rosenblum testified that Child's relationship with Foster Mother is essential to his well-being. Id. Dr. Rosenblum stated that because Child is at an age where he is actively forming his primary attachment and primary sense of emotional support, it would be very emotionally damaging and stressful for Child if he were removed from Foster Mother's care. Id. at 125. Dr. Rosenblum also testified that, due to Child's sensitive temperament, his

pronounced emotional dependency and strong degree of attachment to Foster Mother, it would be extremely difficult and traumatic for Child to forge a relationship with any other caregiver other than Foster Mother. Id. at 132. Dr. Rosenblum testified that, because Child last had contact with Father when he was three months old and has not had contact since his placement, Child did not have and does not have any type of meaningful relationship or attachment with Father, let alone any awareness or familiarity of Father. Id. at 127. Dr. Rosenblum opined that, if Father is found not guilty and permitted visitation, visitation may be more harmful than beneficial at this time. Id. at 138. Dr. Rosenblum testified that, although children benefit from a relationship with a biological parent and Father has not been convicted of the charges against him, preserving Child's immediate psychological needs outweighs preserving his relationship with Father. Id. at 134.

Dr. Rosenblum testified that Foster Mother was very warm, affectionate, nurturing, and engaging with Child. Id. at 121-122. Dr. Rosenblum stated that Foster Mother did an outstanding job of promoting Child's cognitive development by engaging him in a variety of age-appropriate learning activities and constantly provided Child with praise, encouragement and support. Id. at 122. Dr. Rosenblum reported that Foster Mother has an excellent support system with her family, friends and church family, who are very excited about Child being placed with her. Id.

at 123. Dr. Rosenblum stated that he was impressed with Foster Mother's ability to understand Child's needs and provide him with a structured routine. Id. at 122. Dr. Rosenblum testified that Foster Mother does an outstanding job of keeping Child's day to day life as consistent and as supportive as possible. Id. Dr. Rosenblum stated that Foster Mother is capable of providing long-term stability for Child, appropriately meets his needs, and is committed to making him a major priority in her life. Id. at 133. Dr. Rosenblum opined that Child's developmental needs and emotional wellbeing would be best served through the goal of adoption as this provides Child with needed permanency and opportunity to develop a secure and trusting relationship, and remain in a home capable of meeting his needs. Id. at 127.

Based on the foregoing evidence and the totality of the record, we discern no abuse of discretion or legal error by the trial court in concluding that termination of Father's parental rights would best serve Child's psychological, emotional and developmental needs and welfare. The trial court thoroughly considered Child's bond with Father, and the effect of severing that bond. The record supports the trial court's determination that there is no bond or substantial relationship between Child and Father that, if severed, would cause a detrimental effect on Child. Further, the record supports the finding of the trial court that Child's primary bond is with Foster Mother, who has afforded him permanency and fulfilled his developmental,

physical, and emotional needs.  See 23 Pa.C.S. § 2511(b).  The evidence also establishes that if Child is removed from Foster Mother's care, it would cause Child severe emotional distress.  As such, the trial court correctly prioritized Child's emotional well-being and his need for safety, permanency and stability over Father's wishes.  While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights.  See In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010).  As we stated, "a child's life simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting."  In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (citation and quotation marks omitted).  Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment."  In re B., N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).  It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely."  In re Adoption of C.L.G., 956 A.2d at 1007 (citation omitted).  Thus, the failure to terminate Father's parental rights would condemn Child to a life in foster care with no possibility of obtaining a permanent and stable home.

As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we would find no abuse of the

trial court's discretion in terminating Father's parental rights to Child under Section 2511(b). In re T.S.M., 71 A.3d at 267. We, therefore, affirm the trial court's order terminating Father's parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/3/2017